**ATTACHMENT A**
**STIPULATION OF FACTS**

*The undersigned parties stipulate and agree that if this case had proceeded to trial, these Offices would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all the evidence that would have been presented had this matter proceeded to trial.*

### I. Background

The U.S. Bureau of the Census ("Census Bureau") was a bureau in the U.S. Department of Commerce. The Census Bureau was headquartered in Suitland, Maryland.

The Defendant, **CAMILLE T. JONES ("C. JONES")**, was employed by the Census Bureau from in or about December 2015 to in or about June 2023, including as the Assistant Division Chief for Enterprise Resources, Administrative Customer Service Division, Chief Administrative Office. In this supervisory position, **C. JONES** was responsible for, among other things, overseeing services for the Census Bureau's Employee Assistance Program ("EAP"). **C. JONES** was a "public official" within the meaning of 18 U.S.C. § 201(a). While employed by the Census Bureau, **C. JONES** owned and operated several businesses, including **CHARTUM JONES THERAPEUTIC CONSULTING, LLC ("CJTC")**, a mental health company that **C. JONES** formed in the State of Maryland on or about September 9, 2014.

Company B was a limited liability company formed in the State of Maryland in or about 2009, and headquartered in Oxon Hill, Maryland. Company B, which was owned by Person B, provided data management services, among other things, to federal and state clients, including the Census Bureau.

**YOLANDA M. JONES ("Y. JONES")**, was related to **C. JONES** by marriage. On or about February 28, 2020, Y. JONES formed YMJ Counseling & Consulting, LLC ("YMJ") in the State of Maryland.

PERSON C was employed by the Census Bureau as an EAP Counselor from in or about September 2016 to in or about March 2024. PERSON C was associated with Y. JONES and **C. JONES**.

PERSON D was employed by the Census Bureau as a Program Analyst from in or about August 2020 to in or about August 2023. PERSON D was associated with Y. JONES and **C. JONES**.

PERSON E was associated with Y. JONES and **C. JONES**. PERSON E owned a company formed in the State of Florida on or about February 21, 2022.

## II.    The Census Bureau's EAP Contract

On or about May 28, 2020, the Census Bureau awarded a one-year, sole-sourced contract to Company B that totaled approximately $2,860,000. Although the contract initially focused on Company B's digitization services, it was modified on or about July 9, 2020, to add approximately $1,089,000 and include a fund for EAP services (hereinafter the "EAP contract"). The EAP contract was renewed as a two-year contract on or about May 28, 2021. On or about July 2, 2021, the EAP contract was modified to increase the overall amount to approximately $4,425,690.09.

YMJ served as a subcontractor on the EAP contract awarded to Company B, and C. JONES steered the procurement process to ensure that Company B retained Y. JONES and YMJ as a subcontractor.

Between in or about June 2020 and in or about July 2023, YMJ received approximately $2,594,400 in contract proceeds while serving as Company B's subcontractor on the EAP contract with the Census Bureau. Of this amount, Y. JONES and YMJ transferred approximately $790,000 to C. JONES and CJTC for the enrichment of C. JONES. Y. JONES also used a portion of the contract proceeds to pay others, including approximately $41,812 for PERSON C; approximately $20,000 for PERSON D; approximately $20,199 for PERSON E; and approximately $4,560 for PERSON E's company.

## III.    The Corrupt and Fraudulent Scheme Regarding the EAP Contract

Beginning in or about January 2020, and continuing until in or about July 2023, in the District of Maryland and elsewhere, C. JONES, Y. JONES and others agreed to engage in a corrupt and fraudulent scheme in which C. JONES steered the procurement process for the Census Bureau's EAP contract to ensure that (a) Company B, the prime contractor, would retain YMJ as a subcontractor; (b) the EAP contract would be renewed and modified in a manner that benefitted Y. JONES and YMJ; (c) in exchange, Y. JONES and YMJ would use a large portion of the EAP contract proceeds to make a stream of payments to C. JONES, CJTC, and others associated with Y. JONES and C. JONES; and (d) C. JONES, Y. JONES, and others would conceal the corrupt and fraudulent scheme from the Census Bureau and others.

In exchange for these payments, C. JONES was placed on retainer and agreed to perform, and did perform, official acts—and advised other officials, knowing and intending such advice to form the basis for official acts—on an as-needed basis for YMJ and Y. JONES as opportunities arose. C. JONES's official acts, and C. JONES's efforts to influence other officials, benefited Y. JONES, C. JONES, PERSON C, PERSON D, and PERSON E, and their respective companies regarding the awarding, modifying, administering, and supervising of the Census Bureau's EAP contract awarded to the prime contractor, Company B.

To further the conspiracy and scheme and to effect its objects, C. JONES, Y. JONES, and others committed numerous overt acts in the District of Maryland and elsewhere, including the following examples:

Rev. August 2018

2

Between on or about July 2, 2021 (after the EAP contract was modified), and on or about June 20, 2023, C. JONES, frequently using a personal email account, continued to: (a) provide and discuss content material for Y. JONES, including preparing monthly reports for YMJ so that Y. JONES could forward them to Company B for compliance purposes; (b) draft or edit Y. JONES's proposed email responses to Company B; (c) attempt to locate new business opportunities for Y. JONES and YMJ; (d) participate in Zoom video conferences with Y. JONES and PERSON C; and (e) cause Census Bureau employees to pay outstanding invoices and accelerate payments to Company B and YMJ.

Between on or about October 20, 2020, and on or about May 1, 2023, YMJ paid C. JONES and CJTC a total amount of approximately $790,000, including several payments of between $10,000 and $30,000 through interstate wire transfers. The funds used to make these payments came from the EAP contract funds paid to YMJ pursuant to YMJ's subcontract with Company B.

C. JONES attempted to obstruct the investigation of the instant offense of conviction. In 2024, C. JONES drafted a "Mutual Agreement for Services" between YMJ and CJTC to conceal the true nature and purpose of the above payments from YMJ to CJTC and make them appear like legitimate consulting payments. The Mutual Agreement falsely claimed that YMJ would compensate CJTC for certain mental health services provided by CJTC, including executive coaching and case management. Both C. JONES and Y. JONES signed the Mutual Agreement in 2024 with a backdate of November 1, 2020. C. JONES provided the draft Mutual Agreement to Y. JONES, who then provided the document to law enforcement after law enforcement had disclosed the existence of the ongoing investigation of the instant offense of conviction.

## IV.    Other Relevant Conduct

Beginning no later than April 2020 and continuing until at least in or about early 2022, C. JONES used her official position to share the Bureau's confidential contracting information with another government contractor, Company C, and its owner and operator, PERSON F, to benefit Company C and PERSON F in obtaining and retaining Bureau contracts and modifications.

In or about February 2022, during the period in which C. JONES was providing preferential treatment and competitive advantages to Company C and PERSON F, C. JONES requested that PERSON F hire PERSON E to work on a Bureau contract awarded to Company C.

C. JONES and PERSON E communicated about this position through their personal email accounts and, after PERSON E received the position, C. JONES used her personal email account to send emails to PERSON E attaching reports and other work product that PERSON E was supposed to perform on behalf of Company C.

Rev. August 2018

3

In total, PERSON E received payments totaling approximately $83,000 for a position involving minimal work.

SO STIPULATED:

_____
Megan S. McKoy
Assistant United States Attorney

_____
Edward P. Sullivan
Acting Chief, Public Integrity Section

_____
Camille T. Jones
Defendant

4/2/26

_____
Jonathan Hettleman, Esq.
Maggie Grace, Esq.
Counsel for Defendant

4/2/26

Rev. August 2018

4