### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **vs.** | * | **Crim. No. LKG-26-92** |
| | * | |
| **CAMILLE T. JONES,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ****** | |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States of America respectfully submits this memorandum in aid of the sentencing hearing for Defendant Camille T. Jones.  The defendant pleaded guilty to participating in a large procurement fraud and kickback scheme while serving in a supervisory capacity with the U.S. Bureau of the Census ("Census Bureau").  The advisory guideline range in this instance, before accounting for the statutory maximum, is 9-11 years.  The government, while negotiating a plea resolution with defense counsel, provided the defendant with a substantial, front-end concession by agreeing to allow her to plead to a single count conspiracy charge, thereby limiting her exposure to 60 months or roughly half the applicable sentencing range.  As such, and because the circumstances justify it, both the government and the U.S. Probation Office ("USPO") recommend a term of incarceration of 60 months, the statutory maximum, along with a forfeiture order in the amount of $790,000.  The defendant's conduct was calculated, deliberate, and grounded in greed, self-interest, and a severe betrayal of the public's trust.  She should serve a meaningful custodial sentence, and no further downward variance is warranted.

### I.      PROCEDURAL BACKGROUND

On March 9, 2026, the defendant was charged in a one-count criminal information with conspiracy to commit bribery or a public official and commit honest services wire fraud, in

violation of 18 U.S.C. § 371.  ECF No. 1.  Pursuant to a written plea agreement, ECF No. 13, the defendant pleaded guilty on August 2, 2026.  ECF No. 8.

The parties and the USPO concur regarding the advisory guidelines range.  The guideline for a violation of 18 U.S.C. § 371 is found in U.S.S.G. § 2X1.1.  Pursuant to § 2X1.1(a)(1), the base offense level is derived from the guideline for the substantive offense, plus any adjustments for intended offense conduct that can be established with reasonable certainty.  Here, the applicable guideline for the substantive offenses—bribery of a public official, in violation of 18 U.S.C. § 201(b)(1-2), and honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346—is U.S.S.G. § 2C.1.  Pursuant to this guideline, the parties have stipulated to the following calculation, which is non-binding on the Court:

- The base offense level is 14 because the defendant was a public official.  U.S.S.G. § 2C1.1(a)(1).

- A two-level enhancement is applied because the offense involved more than one bribe or kickback.  U.S.S.G. § 2C1.1(b)(1).

- The offense level is increased by 14 levels because the value of the benefits received in return for the payments was greater than $550,000 and less than $1,500,000.  U.S.S.G. §§ 2C1.1(b)(2) and § 2B1.1(b)(1)(H).

- A four-level enhancement is applied because the offense involved a public official in a high-level decision-making or sensitive position.  U.S.S.G. § 2C1.1(b)(3).

- The defendant's offense level is adjusted by two levels, pursuant to U.S.S.G. § 3C1.1, because the defendant admitted that she willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with the respect to the federal investigation.

ECF No. 13 ¶ 6.

The total offense level, Level 36, is reduced by five levels to Level 31 (108-135 months), because the defendant has accepted responsibility in a timely manner, and she meets the criteria of a zero-point offender.  However, the adjusted total offense level is greater than the statutory

maximum of 60 months. "Where the statutorily authorized maximum sentence is less than then the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence." U.S.S.G. § 5G1.1. A guideline sentence of 60 months is warranted under the circumstances.

## II.    OFFENSE CONDUCT

The offense conduct, which is described in detail in court documents and the PSR, is egregious. *See* PSR ¶¶ 7-25; ECF No. 13-1 (Statement of Facts). In summary, the defendant admitted as part of her guilty plea that she steered a large employee assistant program ("EAP") contract to a prime contractor and a subcontracting company, YMJ Consulting, which is owned by the defendant's relative, Yolanda M. Jones. The contract was worth millions of dollars. In exchange for steering the contract and modifications, the defendant received kickbacks from YMJ Consulting and Jones totaling $790,000.[1] Additionally, the defendant attempted to obstruct the investigation by drafting a service agreement between YMJ Consulting and a mental health company that the defendant owned to make the kickbacks appear like legitimate consulting payments between the two companies. Both the defendant and Jones signed the agreement in 2024 but backdated it to 2020. Jones then provided the document to law enforcement in response to a grand jury subpoena served on YMJ Consulting. PSR ¶ 21; ECF No. 13-1 at 3.

Finally, the defendant also admitted that she used her official position to share the Census Bureau's confidential procurement information with another government contractor. While receiving preferential treatment, the contractor hired another one of the defendant's relatives for a

---

[1]    Jones also used the proceeds to pay more than $86,000 to other family members, including two relatives who were also employed by the Census Bureau. PSR ¶ 17; ECF No. 13-1 at 2.

minimal-work job.  The defendant largely performed the work but the relative received $83,000. PSR ¶¶ 22-25; ECF No. 13-1 at 3-4.

### III.   ARGUMENT

Under 18 U.S.C. § 3553(a), the Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing.  In determining the appropriate sentence, the Court must consider, among other things, the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; the need for deterrence; and the need to avoid unwarranted sentencing disparities.

After considering these factors, the government respectfully submits that a sentence of  60 months' imprisonment is appropriate, reasonable, and necessary in this case.

#### A.   The Nature and Circumstances of the Offense

The nature and circumstances of this offense weigh heavily in favor of a substantial term of imprisonment.  This was not a momentary lapse in judgment, an isolated ethical violation, or a technical misuse of authority.  This was a deliberate, corrupt scheme carried out by a Census Bureau official holding a managerial position.  As the Assistant Chief for Enterprise Resources, Administrative and Customer Services Division, the defendant was entrusted to oversee and manage critical human resource functions, use public funds responsibility, and serve as an intermediary between the Census Bureau's programming and procurement officials.  Rather than safeguard those responsibilities, she exploited them.

The defendant used the authority of her office to facilitate kickbacks to herself.  The brazenness of the conduct is evident.  The defendant did not simply accept gifts from a government contractor while attempting to remain detached from the underlying scheme.  Instead, she and

Jones secretly plotted to steer a lucrative contract to an experienced government contractor that had no experience providing EAP services. The defendant and Jones then ensured that the prime contractor would retain Jones's newly formed company, YMJ Consulting, as a subcontractor to perform the EAP services even though Jones herself had never worked on any government contracts. When the initial EAP contract was about to expire, the defendant directed others to renew and modify the contract in a manner that benefited YMJ.

To achieve their objectives, the defendant and Jones downplayed and concealed their familial relationship; they communicated "off the grid" through personal email accounts and in-person meetings; they shared confidential information and work product with each other; and they sold YMJ Consulting to others as an experienced and bona fide contractor. Post-award, the defendant helped YMJ Consulting fulfill its contractual obligations by assisting Jones behind the scenes, including drafting and reviewing YMJ Consulting's work product.

When the money on the EAP contract started to flow, the payments to the defendant increased in both frequency and amount. The co-conspirators not only took care of themselves, but they also made sure that three other family members (including two who were already employed by the Census Bureau) shared in their ill-gotten gains. PSR ¶ 17; ECF No. 13-1 at 2. When the defendant saw an opportunity to help another family member, she took steps to have another Census Bureau contractor hire the family member for a job that paid $83,000 for minimal work. PSR ¶¶ 22-25; ECF No. 13-1 at 3-4. And, finally, when she learned about the government's criminal investigation, the defendant obstructed it. Her conduct in the aggregate reflects consciousness of guilt and demonstrates that the scheme involved calculated corruption—not negligence, confusion, or poor judgment.

The offense here is particularly serious because it involves federal contract funds earmarked for a critical human resource function. EAPs are vital to the proper functioning of the federal workforce. Among other things, they include voluntary, confidential resources that provide free assessments, short-term counseling, and referrals to help employees manage personal and work-related challenges and crises. EAP services reduce absenteeism, maintain productivity across the government workforce, and safeguard the overall wellness of federal employees. Given her training, educational background, and work experience as a licensed therapist, the defendant, of all people, knows the importance of EAPs. Despite this knowledge, she chose to exploit those same resources for personal gain.

Public corruption is always damaging, but corruption involving procurement fraud has an especially corrosive effect because it undermines public confidence in the government's ability to administer taxpayer dollars honestly and responsibly. Citizens must be able to trust that public officials overseeing taxpayer-funded resources and programs will administer them fairly and lawfully—not divert them into corrupt schemes benefiting insiders, allies, and relatives.

The offense conduct here also reflects sustained and intentional abuse of government power. The defendant occupied a gatekeeping role. Her position gave her the ability to influence the selection of government contractors, the amounts to be awarded, and the modification of services. She also oversaw the performance of these essential administrative services. Instead of acting as a safeguard against fraud, waste, and abuse, she used her authority to contribute to it. In doing so, she transformed a position intended to protect the integrity of public services and spending into a mechanism for personal enrichment.

As noted above, the offense also involved concealment and coordination. This was not spontaneous conduct; it involved numerous covert communications between the defendant and

Jones, including falsifying records to thwart the government's criminal investigation. Such conduct, again, reflects planning and sophistication and a willingness by the defendant to subjugate her public obligations to her personal financial interests over an extended period.

The Court should also consider the broader institutional harm caused by offenses of this nature. Corruption committed by senior government officials inflicts damage far beyond any immediate monetary loss. It erodes public confidence in government institutions, undermines faith in the fairness of public administration, and fosters cynicism among citizens who expect honesty from those entrusted with public office. When the official involved is the person responsible for overseeing the well-being of the Census Bureau's own workforce, the resulting harm to the public's trust is even more profound. The public must be able to believe that government contracts are administered based on lawful considerations rather than personal relationships or private financial gain. The defendant's conduct struck directly at that principle.

Ultimately, the offense conduct reflects greed, abuse of power, and a profound betrayal of public trust. The defendant was supposed to safeguarding government programs. Instead, she used her authority to help facilitate a kickback scheme tied to much-needed EAP resources. The seriousness of that conduct strongly supports a significant custodial sentence.

### B.      History and Characteristics of the Defendant

The government acknowledges that the defendant has achieved substantial professional success and has, by all outward appearances, lived a stable and accomplished life. But those characteristics do not mitigate her conduct. If anything, they aggravate it.

This is not a case involving a vulnerable or unsophisticated defendant who lacked education, experience, a supportive family, or understanding of the consequences of her actions. The defendant is highly educated, professionally accomplished, and deeply experienced in

government administration and program management. She was well-paid as a federal employee, and she enjoyed the financial stability and professional stature associated with a successful public career. Although the defendant has suggested that she suffers from gambling and health-related issues, *see* PSR ¶¶ 49-54, the evidence, on balance, does not suggest she was struggling for financial survival, acting out of desperation, or manipulated into participating in conduct she did not understand. The defendant, instead, simply wanted to have a good time. She used the kickback payments mostly for extravagant international travel and as part of a house-flipping business.

The defendant's background is significant because it demonstrates that she fully understood both the mechanics and the unlawfulness of the scheme. The defendant was not merely familiar with program management, she oversaw the programs, she understood the administrative process, and she knew how could exploit the process to her advantage.

The defendant's conduct also reflected a high level of sophistication. The defendant ensured that she and Jones stayed "off the grid" by communicating through personal email accounts. They attempted to obstruct the investigation by falsifying records, and they took other steps to conceal their activity and minimize the risk of detection. Such conduct was not impulsive or naïve. It reflected awareness, planning, and consciousness of guilt. The defendant understood the risks associated with the scheme and nevertheless continued participating because she stood to benefit financially.

Despite already holding a high-level government position, the defendant was willing to compromise the integrity of her office, the administration of public funds, and the trust placed in her by the Census Bureau and taxpayers in exchange for personal financial gain. The fact that the benefits were spent on personal extravagances, such as international family vacations, only underscores that this was corruption motivated not by necessity, but by entitlement and greed.

The defendant may point to her education, professional accomplishments, or lack of prior criminal history as mitigating factors. But those very characteristics demonstrate that she had every opportunity to make lawful choices and every ability to understand the consequences of unlawful ones. Her conduct was not the product of ignorance or incapacity. It was the product of deliberate decisions made by a sophisticated public official who knowingly chose personal enrichment over public duty. The defendant understood the fiduciary obligations associated with her position. She understood the importance of transparency and integrity.

The Court should also consider the message conveyed by the defendant's conduct. Individuals in positions like the defendant's position are expected to lead by example. Subordinates within the Census Bureau were entitled to believe that directives from her office were lawful and proper. Instead, the defendant used the imprimatur of her position to advance her personal agenda. In doing so, she abused not only the public's trust, but the trust bestowed by her colleagues.

Finally, if the defendant argues that her lack of criminal history, her employment history, or the collateral consequences associated with this conviction support a substantial downward variance, such claims would be meritless. The Guidelines generally prohibit consideration of socioeconomic status, successful employment history, and reputational collateral consequences in fashioning a sentence. *See* 28 U.S.C. § 994(d) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to . . . socioeconomic status of offenders."); *see also* U.S.S.G. § 5H1.2 (vocational skills and education not ordinarily relevant); U.S.S.G. § 5H1.5 (employment record not ordinarily relevant); U.S.S.G. § 5H1.6 (family ties and responsibilities not ordinarily relevant); U.S.S.G. § 5H1.10 (socioeconomic status not relevant). Indeed, courts have "repeatedly expressed a distaste for sentencing that reflects different standards of justice

9

being applied to white and blue collar criminals," based on the need to deter large-scale fraud and the possibility that a lenient sentence may "undermine[] public confidence in whether the justice system is doing equal right to the poor and the rich as our oath requires." *United States v. Hoffman*, 901 F.3d 523, 556-57 (5th Cir. 2018) (citation modified); *see also*, *e.g.*, *United States v. Morgan*, 635 F. App'x 423, 444 (10th Cir. 2015) (reversing sentence, in part, based on procedural error in relying on such collateral consequences because those rationales "impermissibly favor criminals . . . with privileged backgrounds"); *United States v. Peppel*, 707 F.3d 627, 636 (6th Cir. 2013) (explaining that a lesser sentence based on "humiliation before his community, neighbors, and friends . . . would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along those lines" and rejecting such reasoning (citation omitted)); *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (emphasizing importance of "the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail").

The defendant's history and characteristics do not warrant leniency. Rather, they underscore the seriousness of her abuse of public trust and support the imposition of a substantial custodial sentence.

### C.    The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

A substantial sentence is necessary to reflect the seriousness of this offense and promote respect for the law. Public corruption strikes at the heart of democratic governance. Citizens must

be able to trust that public officials will exercise their authority honestly and in the public interest—not in pursuit of personal gain.  That trust was profoundly violated here.

Rather than serving the public faithfully, the defendant used her office to steer the EAP contract and personally benefitted from the proceeds.  A lenient sentence would fail to adequately account for the seriousness of this conduct and would risk sending the message that corruption involving public funds can be treated lightly.  It cannot.

The sentence imposed must also promote respect for the law.  Public confidence in the integrity of government institutions depends on meaningful accountability for officials who abuse public office.  When senior officials misuse taxpayer funds for personal benefit, the public must see that such conduct carries serious consequences.  A 60-month sentence appropriately reflects the gravity of the offense and provides just punishment.

### D.   The Need for the Sentence to Adequately Deter the Defendant and Others from Engaging in Similar Criminal Conduct

A substantial sentence is necessary to deter this defendant from engaging in future misconduct and to reinforce that abuses of public office carry serious consequences.  The defendant demonstrated a willingness to misuse governmental authority for personal gain despite occupying a position that demanded ethical judgment, transparency, and fiduciary responsibility. This conduct was not reckless or impulsive or driven by gambling or any other compulsion.  It involved deliberate decisions made over several years by an educated and experienced public official who fully understood the significance of her actions.  A meaningful custodial sentence is therefore necessary to deter her from future abuses of authority and to reinforce the principle that public service is a public trust that requires officials and civil servants to place loyalty to the

11

Constitution, the laws, and ethical principles above private gain.  Those who violate this ethical principle must face substantial consequences.

General deterrence is particularly important in public corruption cases and weighs strongly in favor of a significant sentence in this matter.  Public corruption offenses are often hard to detect and are uniquely damaging because they undermine the public's confidence in its government institutions and erodes trust in the integrity of public administration.

A substantial sentence is necessary to send a clear message to other public officials that misuse of public office and diversion of taxpayer resources for personal benefit will not be tolerated.  That message is especially important when dealing with federal procurement, where officials are entrusted with substantial discretion over vast amounts of public resources.  Those officials must understand that with such authority comes profound responsibility and accountability.  When senior government officials abuse their positions to facilitate fraud or enrich themselves through public funds, the resulting damage extends far beyond the immediate financial loss.  It fosters cynicism, weakens public trust, and undermines confidence in the government's ability to administer critical resources fairly and honestly.  Accordingly, a substantial custodial sentence here will serve an important deterrent function and will also promote accountability, protect the integrity of the governmental institutions, and reinforce important ethical principles.

### E.      The Need to Avoid Unwarranted Sentencing Disparities

The government's requested sentence appropriately accounts for both the advisory guideline range and the specific facts and circumstances of this case.  As noted, the defendant has effectively received a built-in downward variance, shaving off more than half of her prison exposure, simply because the government agreed to cap her liability at 60 months.  No further concessions are warranted.  As noted by the USPO, *see* PSR at 19-20, a 60-month sentence

adequately reflects the seriousness of the defendant's conduct, her abuse of the public's trust, and her primary role in facilitating a kickback scheme involving federal contracts.

A within-guidelines sentence is particularly appropriate here because the Sentencing Guidelines were designed to promote national uniformity in sentencing among similarly situated defendants who engage in comparable criminal conduct.  Imposing a sentence within the advisory range therefore serves the important statutory objective of reducing unwarranted disparities while still allowing the Court to account for the individualized facts of the offense and characteristics of the defendant.

To the extent the defendant may rely upon the Judiciary Sentencing Information (JSIN) data included in the PSR, that data is consistent with the government's recommendation and does not warrant a lower sentence.[2]  *See* PSR at 23.

The circumstances of this case also distinguish it from the more routine corruption matters that may be reflected in generalized sentencing data.  Here, the defendant occupied a sensitive supervisory position, and her recommendations carried weight.  She possessed authority over the administration and funding of the EAP program.  She used that authority not to protect public resources, but to facilitate fraudulent conduct.  The offense also involved deliberate coordination, misuse of public monies, and efforts to structure the conduct to avoid scrutiny and detection.  Those

---

[2]    Although JSIN statistics can provide a general reference point for sentences imposed in other public corruption cases, such data necessarily lacks the context and nuance associated with the particular facts of any given case.  Here, for instance, the data does not fully capture the scope of the defendant's abuse of authority, the nature of the federal funds involved, the extent of the planning and coordination reflected in the offense conduct, or the broader institutional harm caused by corruption committed by a senior financial official entrusted with oversight of emergency federal funding.  JSIN data, moreover, reflects aggregated national sentencing information across a broad range of offenses, defendants, factual scenarios, and jurisdictions.

aggravating circumstances justify a sentence at the statutory maximum, 60 months, notwithstanding any generalized national sentencing averages.

## IV.    CONCLUSION

For the foregoing reasons, and after consideration of the factors set forth in 18 U.S.C. § 3553(a), the government respectfully requests that this Court impose a sentence of 60 months' imprisonment.   Such a sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the integrity of public institutions and taxpayer funds.

Respectfully submitted,

KELLY O. HAYES
UNITED STATES ATTORNEY

Dated:  July 2, 2026            By:        _____/s/_____
Megan S. McKoy
Assistant United States Attorney
U.S. Attorney's Office
District of Maryland
6406 Ivy Lane, Suite 800
Greenbelt, MD 20770
Tel: 301-344-4433
Email: Megan.McKoy@usdoj.gov

EDWARD P. SULLIVAN
Acting Chief, Public Integrity Section
U.S. Department of Justice

By:    _____
Edward P. Sullivan
Acting Chief, Public Integrity Section
1301 New York Ave., N.W., 10th Floor
Washington, D.C. 20530
Tel: (202) 514-1412
Email: Edward.Sullivan@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

Dated: July 2, 2026

*Edward P. Sullivan*

Edward P. Sullivan